[Cite as *Ladd v. Planchak*, 2024-Ohio-24.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| B. GARY LADD, | : | |
| | : | |
| Appellees | : | C.A. No. 29830 |
| | : | |
| v. | : | Trial Court Case No. 2018 CV 05486 |
| | : | |
| MICHAEL P. PLANCHAK, et al. | : | (Civil Appeal from Common Pleas Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 5, 2024

. . . . . . . . . . .

PATRICK J. JANIS, Attorney for Appellees

MICHAEL P. PLANCHAK, Appellant, Pro Se

. . . . . . . . . . . .

WELBAUM, P.J.

**{¶ 1}** Appellant, Michael P. Planchak, appeals pro se from a judgment assessing damages against him for breach of contract and from a judgment overruling his motion for a new trial. After a trial, the jury found that Planchak was required to pay Appellee B.

Gary Ladd $198,046.97 for expenses Gary[1] had incurred in connection with the parties' joint venture (ownership of a condominium). The jury also rejected Planchak's counterclaims against Gary for fraudulent transfer, fraud or concealment, breach of fiduciary duty, and willful damages or theft, as well as Planchak's third-party claim for unjust enrichment against Appellee Patricia Ladd, who is Gary's wife.

{¶ 2} Planchak has asserted six assignments of error: (1) Gary was not permitted to maintain a contract action in the trial court because there had been no prior accounting or settlement of the joint venture's affairs; (2) the trial court erred in failing to apply partnership law to termination of the joint venture; (3) the court improperly excluded the testimony of Planchak's proposed expert; (4) the court erred in failing to dismiss the case on "summary judgment"; (5) the court erred in failing to offer any set-off after the jury concluded that Gary had failed to mitigate damages; and (6) the court erred in refusing to order the Internal Revenue Service ("IRS") to provide certified copies of the Ladds' tax returns.

{¶ 3} After reviewing the record, we find no merit to Planchak's assignments of errors. For the reasons that follow, all the assignments of error will be overruled, and the judgments of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 4} This case arises from the joint decision of Gary and Planchak to purchase a

---

[1] Because Gary and Patricia Ladd are both parties to this case, we will refer to them individually by their first names and collectively as the "Ladds." We will also refer to Patricia as "Pat."

condominium to be built in a project known as Cappello I at the Venetian Golf and River Club in Venice, Florida. They planned to purchase the condo before construction, sell it a few days after it was built, and split the proceeds. *Planchak v. Ladd*, 2d Dist. Montgomery No. 29703, 2023-Ohio-1836, ¶ 4. "On June 29, 2005, with Planchak's knowledge, Gary executed a purchase contract for a condominium at the resort for $564,990. The price was to be paid as follows: an initial payment of $5,000; $107,998 to be paid on July 14, 2005, and the balance of $451,992 due at closing. On July 21, 2005, Planchak gave Gary a check for $60,000; the memo line on the check reflected that the amount was for '1/2 interest in the Venetian condo.' " *Id.* at ¶ 5.

{¶ 5} The parties and Gary's wife, Pat, signed an agreement stating that:

> This document is to verify that Michael P. Planchak is 50% owner in a property located at IFL and Venetian Golf and River Club. Because of their business experience, it is agreed that [Gary] Ladd, and or Pat Ladd, will be responsible for the business decisions, the decisions to be made in an effort to make the maximum profit from the property. In the event of a death or incapacity of Pat and Gary Ladd, either Michael P. Planchak or the Ladd interests can call for the sale of the property at market value at any time.

*Id.*

{¶ 6} During the construction process, Gary told Planchak that due to softening market conditions, they might not be able to realize a profit. As a result, they agreed to obtain an interest-only mortgage and to title the deed only in Gary's name. *Id.* at ¶ 6.

"On March 23, 2006, Planchak transferred $7,585.84 to [Gary] for his share of the closing costs. The closing occurred on March 29, 2006. Planchak did not attend. By mid-April, it was clear to the parties that they could not resell the property for a profit because its market value was $50,000 to $75,000 less than their cost of about $595,000." *Id.* at ¶ 7.

{¶ 7} While Gary wanted to furnish the property and lease it to a third party, Planchak disagreed. *Id.* at ¶ 8. Planchak then filed suit against Gary on June 6, 2006, seeking a return of the money he had invested; Gary counterclaimed for expenses he had paid to maintain the property. *Id.* at ¶ 2. In September 2006 (during the litigation), "[Gary] leased the condominium, and the lease income was allocated to the expenses incurred during the period of the lease." *Id.* at ¶ 8. Gary then applied Planchak's part of the income to the interest-only mortgage, which was $3,500 per month. During that time, Gary paid all other expenses to maintain the property, which amounted to $41,591.32 through the end of January 2007. *Id.*

{¶ 8} After holding a bench trial, the court awarded Gary $20,795.66 plus eight percent annual interest and ordered both parties to pay the ownership expenses for the condo until it was sold. *Id.* at ¶ 10. Planchak appealed from this judgment in June 2007 but subsequently dismissed the appeal. *Id.* at ¶ 3.

{¶ 9} On November 27, 2018, Gary filed a foreclosure complaint against Planchak, seeing to foreclose on property Planchak owned in Dayton, Ohio. Additional defendants were Fifth Third Bank ("Fifth Third"), which was alleged to have an interest in the property, and the Montgomery County Treasurer ("the Treasurer"), which might have had a

property tax lien.   The complaint was based on a certificate of judgment that Gary had filed with respect to the 2007 judgment, which Planchak had allegedly not paid.   Both Fifth Third and the Treasurer filed answers, but before Planchak filed an answer, the court administratively stayed the action in March 2019 at the request of Gary and Planchak, due to ongoing litigation in the 2006 case over the validity of the certificate of judgment.

{¶ 10} In October 2019, Gary filed an amended complaint for foreclosure and added a claim for breach of contract based on Planchak's alleged failure to pay any expenses for the condo, which Gary claimed he had been unable to sell.   Planchak filed an answer and counterclaim on November 20, 2019.   In the counterclaim, Planchak alleged a fraudulent transfer of Gary's interest in the condo to Pat, breach of fiduciary duty, contempt based on Gary's failure to transfer an interest in the condo to Planchak as ordered by the 2007 judgment, willful damage or theft, and fraud or concealment. Planchak also included a third-party complaint against Pat for fraudulent transfer and unjust enrichment, based on the transfer of the condo property to her.   Attached as Ex. A was a 2013 quit-claim deed that Gary had signed.

{¶ 11} Fifth Third filed an answer to the amended complaint on November 21, 2019, and alleged that Planchak owed it $117,855.60 plus interest on an $118,000 mortgage loan filed with the Montgomery County Recorder in June 2006.   Gary and Patricia then filed answers to the counterclaim and third-party complaint in December 2019.

{¶ 12} The court initially set a jury trial for October 19, 2020.   Subsequently, in May 2020, Planchak filed a motion to compel discovery.   After the Ladds filed affidavits

indicating they had provided all records in their possession, including income tax records, the court overruled the motion to compel as moot in February 2021.

{¶ 13} Previously, in July 2020, Planchak had filed an amended answer, counterclaim, and third-party complaint, adding claims against Pat for fraud, deceit, concealment and/or misrepresentation; this was followed shortly thereafter by the Ladds' answers to the amended counterclaim and third-party complaint. In August 2020, the trial was continued due to the COVID-19 pandemic. The court then set a new trial date of March 1, 2021, which was later changed to October 27, 2021.

{¶ 14} In August 2021, the court filed an order extending the discovery deadline to February 15, 2022, and it again continued the trial, this time to May 16, 2022. At Planchak's request, the court once more extended the discovery deadline to April 15, 2022, and also extended Planchak's deadline for filing his expert's report. Subsequently, based on another Planchak request, the court further extended the discovery deadline to July 13, 2022, and moved the trial date to October 11, 2022.

{¶ 15} In May 2022, the court granted the motion of Planchak's counsel to withdraw. At that time, the court advised Planchak to obtain new counsel immediately, given the October 2022 trial date. Planchak's new counsel did not, however, file a notice of appearance until July 11, 2022. Shortly thereafter, Gary filed a motion in limine to prevent introduction of expert opinions of Planchak's expert (Zara Rhone) and to prevent relitigation of issues already decided in the prior action. The trial court then filed a decision on September 8, 2022, stating that issues decided in the prior case would not be relitigated. In addition, the court placed certain restrictions on Rhone's testimony and

limited rebuttal testimony of the Ladds' expert, Bruce Carter, to matters on which Rhone was allowed to testify. Subsequently, on September 30, 2022, the court granted the Ladds' motion for reconsideration of the liminal motion and held that Rhone would not be allowed to testify because her expert report contained no admissible opinions. Correspondingly, the court prohibited Carter's rebuttal testimony. In addition, the court held that the foreclosure claim and Planchak's two contempt motions would not be heard in the jury trial, as they involved equitable issues. Other issues, including punitive damages and attorney fees, also would not be heard unless Planchak prevailed on his own claims.

{¶ 16} The jury trial was held as scheduled in October 2022. The jury found in Gary's favor against Planchak in the amount of $198,046.97 and in the Ladds' favor on Planchak's counterclaim and third-party complaint. The court later granted Gary's summary judgment motion on Planchak's contempt claims, stating that there was no cognizable claim for contempt and that Planchak should have brought these claims in the 2005 action. The court further noted that Gary had dismissed his foreclosure claim in December 2022. After the court filed a final judgment entry on April 24, 2023, Planchak filed a motion for new trial. The court denied the new trial motion on June 9, 2023, and Planchak filed a pro se notice of appeal on June 14, 2023.

## II. Ability to Bring an Action

{¶ 17} Planchak's first assignment of error states that:

The Trial Court Erred in Permitting the Plaintiff to Maintain an Action

at Law and Submitting the Issues to the Jury Where There Had Been No Prior Accounting or Settlement of the Affairs of the Joint Venture.

{¶ 18} Under this assignment of error, Planchak contends that Gary was not allowed to maintain an action in the trial court because there had been no prior accounting or settlement of the joint venture's affairs. In support of his position, Planchak cites case law stating that partnership rules apply to joint ventures and other pre-2000 case law providing, essentially, that partners may not bring actions against co-partners for payment of partnership debts before a final partnership accounting has been made. Appellant's Brief, p. 8-9. Planchak admits that he failed to raise this issue in the trial court and that, therefore, his argument may be reviewed only for plain error. He nonetheless maintains that plain error exists.

{¶ 19} Before we address Planchak's arguments, we note that "[l]itigants who choose to proceed pro se are presumed to know the law and correct procedure, and are held to the same standards as other litigants." *Yocum v. Means*, 2d Dist. Darke No. 1576, 2002 Ohio 3803, ¶ 20, citing *Kilroy v. B.H. Lakeshore Co.*, 111 Ohio App.3d 357, 363, 676 N.E.2d 171 (8th Dist.1996). Thus, "a pro se litigant 'cannot expect or demand special treatment from the judge, who is to sit as impartial arbiter.' " *Id.*

{¶ 20} Turning to the issue of plain error, "in criminal cases '[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court,' Crim.R. 52(B), [but] no analogous provision exists in the Rules of Civil Procedure." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). Thus, "[i]n applying the doctrine of plain error in a civil case, reviewing courts must

proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Id.*, citing *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209, 436 N.E.2d 1001 (1982). Under the applicable law, no plain error or even any error occurred here.

{¶ 21} "A joint venture is '* * * an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, without creating a partnership, and agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers * * *.' " *Al Johnson Constr. Co. v. Kosydar*, 42 Ohio St.2d 29, 325 N.E.2d 549 (1975), paragraph one of the syllabus, *approving and following Ford v. McCue*, 163 Ohio St. 498, 127 N.E.2d 209 (1955), paragraph one of the syllabus. "The major distinction between a joint venture and a partnership is that a joint venture relates to a single enterprise and a partnership relates to a continuing business." *Vargo v. Clark*, 128 Ohio App.3d 589, 595, 716 N.E.2d 238 (4th Dist.1998), citing *Ford* at 503. The Supreme Court of Ohio noted in *Al Johnson* that "[i]t has been the practice of this court, and indeed the practice of most courts, to apply to joint ventures the law which has developed concerning partnerships." *Id.* at 32.

{¶ 22} The case that Planchak relies on states that: " 'A partner cannot maintain

an action for a money judgment against a co-partner, upon a claim of payment of a partnership debt, before a final accounting of partnership affairs has been had, except upon showing that that particular transaction had, by agreement, been withdrawn from the partnership account.' " *Sekulovski v. Bubev*, 10th Dist. Franklin No. 99AP-1224, 2000 WL 1099501, *4 (Aug. 8, 2000), quoting *Kunneke v. Mapel*, 60 Ohio St. 1, 53 N.E. 259 (1899), paragraph one of the syllabus, and citing *Dunn v. Zimmerman*, 69 Ohio St.3d 304, 307, 631 N.E.2d 1040 (1994).

{¶ 23} Notably, while *Dunn* recognized that the need for an accounting is the traditional common law rule, the court also stressed that exceptions exist. For example, "[i]n Ohio, courts have recognized legal claims between partners without an accounting when the basis of the suit does not involve a searching inquiry into the affairs of the partnership." *Dunn* at 308, citing *Hanes v. Giambrone*, 14 Ohio App.3d 400, 471 N.E.2d 801 (2d Dist.1994). The court further noted that "in the universe of disputes that might arise among partners, there may be some for which a formal accounting would be a pointless exercise. Such cases would involve disputes over a very limited time or number of transactions, whose resolution would not require a searching inquiry into partnership affairs." *Id*. at 309.

{¶ 24} Here, while a lengthy time-period elapsed, the dispute involved only one property, and the evidence was really not complicated. In contrast, the partnership in *Sekulovski* involved "the following properties: a White Castle franchise located in Columbus, Ohio; a Burger King franchise located in Grove City, Ohio; a Wendy's franchise located in Fort Wayne, Indiana; three KFC franchises located in Berea,

Brookpark, and Parma, Ohio; and a Rax franchise located in Kettering, Ohio," as well as issues about whether "partnership profits and property were used properly from 1987 until 1998." *Sekulovski* at *1 and 5.

{¶ 25} Furthermore, both *Dunn* and *Sekulovski* involved R.C. Chap. 1775, the Uniform Partnership Law, which was initially adopted in 1949 as G.C. Chap. 8105. *Dunn* at 306; *Sekulovski* at *4. However, R.C. Chap. 1775 was repealed effective January 1, 2010, and thereafter the "Revised Uniform Partnership Act to be known as the 'Ohio Uniform Partnership Act (1997)" governed all partnerships in Ohio. *See* Sub.H.B. 332, 2008 Ohio Laws 74, effective Aug. 6, 2008. *See also* R.C. 1775.66(A), enacted as part of Sub.H.B. 332 (also stating that R.C. Chap. 1775 does not govern any partnerships on or after January 1, 2010).

{¶ 26} Regarding actions by partners, the law effective for all Ohio partnerships (and thus, joint enterprises) as of January 1, 2010, states that:

A partner may maintain an action against the partnership or another partner for legal or equitable relief, *with or without an accounting as to partnership business*, to enforce any of the following:

(1) The partner's rights under the partnership agreement;

(2) The partner's rights under this chapter, including any of the following:

(a) The partner's rights under sections 1776.41, 1776.43, or 1776.44 of the Revised Code;

(b) The partner's right on dissociation to have the partner's

interest in the partnership purchased pursuant to section 1776.54 of the Revised Code, or any other right under sections 1776.51 to 1776.53 or sections 1776.54 to 1776.58 of the Revised Code;

(c) The partner's right to compel a dissolution and winding up of the partnership business or enforce any other right under sections 1776.61 to 1776.67 of the Revised Code.

(3) The rights and otherwise protect the interests of the partner, including rights and interests arising independently of the partnership relationship.

(Emphasis added.)   R.C. 1776.45(B).

{¶ 27} Consequently, after the law was effective, a partner (or joint venturer) could bring a legal or equitable action without seeking an accounting.   *See Francisco A. Mateo MD, Inc. v. Proia*, 7th Dist. Mahoning No. 22 MA 0053, 2023-Ohio-3908, ¶ 57, fn. 2 (noting that the " 'with or without an accounting' language appears to have altered *Dunn* to the extent it said the accounting was a 'prerequisite' to an action at law except under certain circumstances").   As a result, Gary could bring an action against Planchak even though an accounting had not occurred.   Accordingly, the first assignment of error is overruled.

III.   Application of Partnership Law

{¶ 28} Planchak's second assignment of error states that:

The Trial Court Erred in Failing to Apply the Law of Partnerships to the Termination of the Joint Venture.

{¶ 29} Under this assignment of error, Planchak argues that the trial court erred in

failing to apply partnership law to termination of the joint venture. This was also the subject of Planchak's motion for new trial, which the court overruled. In this regard, Planchak points to the following jury instruction, which stated that: "The general rule is that where the purposes of the enterprise have not been fulfilled, no party has the right to withdraw from or abandoned [sic] it without the consent of his co-venturers." Appellant's Brief at p. 11, quoting Trial Transcript ("Tr.") at 502.

{¶ 30} However, Planchak failed to include the rest of this instruction, which continued by stating that:

> Discovery by one joint venturer that going on with the joint venture can only result in further losses can also terminate the joint venture. Such withdrawal is not permitted without giving notice to the co-venturer.

Tr. at 502-503.

{¶ 31} Our review of the trial transcript and, in particular, the jury instructions, indicates that Planchak failed to object to this jury instruction. Under Civ.R. 51(A), "[o]n appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." An exception exists, however, which lets courts take notice of plain error. *Hild v. Samaritan Health Partner*, 2023-Ohio-2408, 220 N.E.3d 286, ¶ 27 (2d Dist.), citing *Schade*, 70 Ohio St.2d at 209, 436 N.E.2d 1001.

{¶ 32} We decline to do so here. As noted, plain error is only recognized in exceptional situations that "require its application to prevent a manifest miscarriage of

justice." *Goldfuss*, 79 Ohio St.3d at 121, 679 N.E.2d 1099. No such finding could conceivably be made here, since Planchak himself submitted instructions which cited the case the trial court used for the above jury instruction. *See* Planchak's Requested Jury Instructions (Nov. 23, 2022), p. 2 and fn. 4 and 5, which cite *Estep v. Sirk*, 1st Dist. Butler No. CA-74-01-0002, 1975 WL 181232 (1997).

{¶ 33} In *Estep*, the court of appeals stated that:

Although the general rule is that where the purposes of the enterprise have not been fulfilled, no party has the right to withdraw from, or abandon it, without the consent of his co-venturers, where the joint venture agreement fails to state any period of time, or that the venturers are bound for the duration of the project, a participant may have the right to withdraw without being in breach of contract; such agreement being termed a joint venture at will. Another ground which would justify the withdrawal from, or abandonment of, a joint venture is the discovery by one joint venturer that going on with the joint venture can result only in further losses; such withdrawal not being permitted without giving notice to the co-venturers.

*Estep* at *7.

{¶ 34} Comparing this with the instruction the court gave at pages 502-503 of the transcript, the same language was used, except for the part involving a joint venture at will.

{¶ 35} To the extent Planchak contends that error occurred, he would have been the one who caused it. "Under the invited-error doctrine, a party will not be permitted to

take advantage of an error which he himself invited or induced the trial court to make." *State ex rel. Fowler v. Smith*, 68 Ohio St.3d 357, 359, 626 N.E.2d 950 (1994), citing *Center Ridge Ganley, Inc. v. Stinn*, 31 Ohio St.3d 310, 313, 511 N.E.2d 106 (1987). The trial court cited this as a reason for rejecting Planchak's motion for new trial. *See* Decision, Order, and Entry Denying Defendant's Motion for New Trial (June 9, 2023), p. 1. The court's reasoning was correct.

{¶ 36} More importantly, however, Planchak's argument is based on a fundamental misunderstanding of the effect of the 2007 judgment and what he needed to establish at trial. During the most recent trial and on appeal, Planchak claimed that he had terminated the joint venture through a letter sent to Gary's attorney on April 17, 2006. According to Planchak, the letter stated that "he was out of the joint venture." Appellant's Brief at p. 12. His position, therefore, is and has been that the joint venture terminated at that time, and he was not obliged to make any further payments on the condo. At trial, Planchak testified that in light of this letter, he considered his "business deal" with Gary over when the 2007 judgment was entered. Tr. at 367 and 369.

{¶ 37} However, the letter in question was sent before the judgment was entered in the prior case on May 29, 2007. In the decision in that case, the trial court found that "[a]ll the elements of a joint venture were present here." *See Planchak v. Ladd*, Montgomery C.P. No. 06-CV-4854, Decision and Judgment Entry (May 29, 2007) ("2007 Judgment"), p. 14. The court also did not find that the joint venture had terminated. Rather, consistent with an ongoing joint venture, the court ordered "that Plaintiff [Planchak] and Defendant [Gary] pay the expenses of ownership of the subject real estate

including, but not necessarily limited to, monthly mortgage payment, condo fees, taxes, and insurance until said real estate is sold." *Id*. at p. 26. Furthermore, the court did not order a time frame within which the real estate must or should be sold. As noted, Planchak appealed from that judgment but dismissed the appeal. The judgment, therefore, was final.

{¶ 38} Under the "modern application of the doctrine of *res judicata*, as stated in 1 Restatement of the Law 2d, Judgments (1982), Sections 24-25, * * * a valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 382, 653 N.E.2d 226 (1995). "The doctrine of *res judicata* involves both claim preclusion (historically called estoppel by judgment in Ohio) and issue preclusion (traditionally known as collateral estoppel)." *Id*. at 381, citing *Whitehead v. Gen. Tel. Co.*, 20 Ohio St.2d 108, 254 N.E.2d 10 (1969).

{¶ 39} "Claim preclusion prevents subsequent actions, by the same parties or their privies, based upon any claim arising out of a transaction that was the subject matter of a previous action." *O'Nesti v. DeBartolo Realty Corp.*, 113 Ohio St.3d 59, 2007-Ohio-1102, 862 N.E.2d 803, ¶ 6. "Claim preclusion makes ' "an existing final judgment or decree between the parties to litigation * * * conclusive as to all claims which were or might have been litigated in a first lawsuit." ' " *Lycan v. Cleveland*, 171 Ohio St.3d 550, 2022-Ohio-4676, 218 N.E.3d 913, ¶ 22, quoting *Natl. Amusements, Inc. v. Springdale*, 53 Ohio St.3d 60, 62, 558 N.E.2d 1178 (1990). (Other citation omitted.)

{¶ 40} " '[C]laim preclusion has four elements in Ohio: (1) a prior final, valid

decision on the merits by a court of competent jurisdiction; (2) a second action involving the same parties, or their privies, as the first; (3) a second action raising claims that were or could have been litigated in the first action; and (4) a second action arising out of the transaction or occurrence that was the subject matter of the previous action.' " *Id.* at ¶ 23, quoting *Hapgood v. Warren*, 127 F.3d 490, 493 (6th Cir.1997).

**{¶ 41}** All these requirements were met here. Therefore, Planchak was precluded in the current action from relitigating any claims that were brought in the prior action or that could have been brought in the prior action. This included whether his April 17, 2006 "letter" terminated the joint venture. The trial court in that case found that the joint venture existed and did not find that the venture had been terminated; instead, the court ordered that the venture would continue. Again, Planchak could have raised that issue in the prior litigation and could have had the claim determined. He cannot again raise this issue.

**{¶ 42}** "The doctrine of issue preclusion, also known as collateral estoppel, holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different." *Fort Frye Teachers Assn., OEA/NEA v. State Emp. Relations Bd.*, 81 Ohio St.3d 392, 395, 692 N.E.2d 140 (1998). With respect to this point, Planchak cannot contend in the present action that the joint venture did not exist as of May 29, 2007. That issue has already been decided.

**{¶ 43}** Planchak could have asserted in this action (and was allowed to assert) that

he had terminated the joint venture after the May 29, 2007 judgment. Under the case Planchak cited to the trial court, this would have required that he give notice to his co-venturer, Gary, at some point after May 29, 2007. *Estep*, 1st Dist. Butler No. CA-74-01-0002, 1975 WL 181232, at *7. Planchak failed to present evidence that he gave Gary such notice.

{¶ 44} At trial, Planchak admitted several times that he did not communicate directly with either Gary or Pat after the judgment in the prior case was entered on May 29, 2007. Tr. at 230 and 397-398. Likewise, the Ladds testified that they did not communicate or have contact with Planchak after May 29, 2007 (other than sending him a 1099 each year for rental income the joint venture received). They also said that they did not hear from any source that Planchak wanted out of the venture. Tr. at 117, 125, 142, 200, 204, and 302-303, 305, 434-435, and 436. Furthermore, as the Ladds point out, even if the court had used the current partnership statutes that Planchak cites in his brief, notice still had to be given. *See* Appellees' Brief, p. 7, citing Appellant's Brief at p. 11-12.

{¶ 45} Specifically, one of the cited statutes, R.C. 1776.51, states that "[a] partner is dissociated from a partnership upon the occurrence of any of the following events: (A) The partnership has notice of the partner's express will to withdraw as a partner, on the date of the notice or on a later date the partner specifies."[2] Again, the evidence of notice that Planchak relies on is the April 17, 2006 "letter." *See* Appellant's Brief at p. 12.

{¶ 46} The other statute that Planchak cites in his brief is R.C. 1776.61(A). *Id.*

---

[2] None of the other events listed in R.C. 1776.51 apply here. *See* R.C. 1776.51(B)-(J).

However this statute does not apply here, as it relates to partnerships at will. The joint venture involved here was not at will; there was a written agreement and a court judgment that the elements of a joint venture existed. Nonetheless, even in that situation, notice of an "express will to withdraw" must be given to the partnership. *Id.*

{¶ 47} Consequently, even if the court had used the partnership law that Planchak advocates, there would have been no difference in what the jury had to consider. Accordingly, the second assignment of error is overruled.

IV. Expert Witness Testimony

{¶ 48} Planchak's third assignment of error states that:

The Trial Court Erred in Precluding Defendant's Expert Witness, a

Certified Public Accountant, From Testifying and Permitted Plaintiff's Wife,

a Tax Preparer, to Testify as an Expert Witness on the Same Subject Matter

{¶ 49} Under this assignment of error, Planchak contends the trial court improperly refused to let his accountant, Zara Rhone, testify as an expert. According to Planchak, the error was compounded because Pat was permitted to testify as a purported expert on tax reporting for joint ventures. Planchak argues that this tainted the verdict because Pat's unrebutted testimony allowed the jury to conclude that the inequitable tax treatment between the parties was proper. As to why this was relevant, Planchak asserts the Ladds' tax returns showed that they were treating the property as their own by denying him any pass-through for joint venture expenses, and that this conduct established that the joint venture had terminated. Appellant's Brief at p. 14; Appellant's Reply Brief at p.

5-6. In this vein, Planchak maintains the Ladds were "treating him as a patsy by transferring all income to him." Appellant's Reply Brief at p. 6.

{¶ 50} Before we address Planchak's argument, we note that the last statement is factually incorrect. The undisputed trial testimony indicated that the Ladds had paid all expenses associated with the condo since the 2007 judgment and issued 1099s to Planchak for one-half of the income derived from the rental. They also only took deductions for one-half of the expenses they paid because they only owned one-half of the property. Further, all net rental income received was used to pay the mortgage, interest, and taxes on the property. Tr. at 118, 124, 125-126, 130, 298, 299, 301-303, and 351.

{¶ 51} Turning now to the issue of the expert, the trial court first restricted Rhone's testimony and then later found that none of Rhone's opinions were admissible. As to these decisions, the following matters occurred. On May 21, 2021, Planchak identified Rhone as an expert witness. He then filed Rhone's expert report on June 22, 2022, more than a year later. While Rhone's report was confusing, she made the following points: (1) Planchak contributed funds to form a partnership but a partnership was never formed; (2) she wondered how a judgment against Planchak is possible when he was never an owner of the rental property; (3) the IRS would not agree that Planchak can claim money he never received, and Planchak cannot claim deductions he never paid; (4) Gary received Planchak's money and put it into his pocket; (5) there should have been a partnership return form 1065 for each year a partnership existed; (6) 1099 forms were erroneously issued to Planchak; and (7) "Planchak's legal fees have totaled $50,100 over

the last fifteen years to stop this nonsense from continuing and get his money back and stop the erroneous 1099s from continuing each year." June 22, 2022 Expert Report [of] Zara Rhone CPA, p. 1-4. This report was submitted after Planchak's attorney had withdrawn and while Planchak was acting pro se.

{¶ 52} In late July 2022, Gary filed a motion in limine, seeking to exclude introduction of Rhone's expert opinions and to preclude relitigation of issues already decided in the prior action. Subsequently, on September 9, 2022, the court overruled in part and granted in part the motion in limine regarding Rhone's expert testimony. The court held that any issues decided in Judge O'Connell's May 29, 2007 decision would not be relitigated in this case. Decision, Order, and Entry Denying in Part and Granting in Part Motions in Limine Regarding Expert Testimony (Sept. 9, 2022) ("Liminal Entry"), p.5. The court then stated that:

> Putting aside the reliability of Ms. Rhone's testimony, in examining the relevance and confusion of the issues, any opinion testimony that conflicts or calls into question any of the findings in Judge O'Connell's Decision will be prohibited. Specifically, she will not be allowed to testify:
>
> • That the relationship between the parties was a partnership, as it has already been determined to be a joint venture. Accordingly, any opinions she has that partnership returns should have been filed, or any actions should have been taken that flow from an opinion that a partnership existed, those opinions will not be permitted.
>
> • As to any opinions about the parties' actions prior to the trial in

Case No. 2006-CV-4854 on March 5, 2007. This includes any opinions regarding the formation of the relationship between the parties, the amounts invested by either party or how that money was used, the amount or validity of any expenses incurred prior to March 5, 2007, questioning the validity of the judgment entered against Planchak, or any other aspect of the May 29, 2007 Decision.

In the event Ms. Rhone has opinions regarding the issues in the present case, that are not encompassed in the prohibited testimony and that occurred after March 5, 2007, those will be permitted.

Liminal Entry at p. 5-6.

{¶ 53} As previously mentioned, the court also limited rebuttal testimony of the Ladds' tax expert, Carter, to those issues on which Rhone testified. On September 27, 2022, the Ladds filed a motion asking the court to reconsider its ruling on the motion in limine. The court then filed a second decision granting reconsideration and finding that Rhone had offered no admissible opinions. *See* Decision, Order, and Entry Granting Plaintiff's and Third-Party Defendant's Motion for Reconsideration/Second Motion in Limine Excluding Expert's Opinions (Sept. 30, 2022) ("Liminal Entry 2"). This time, in addition to considering relevance, the court also considered admissibility under *Daubert* which states that evidence should be excluded " 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* at p. 2, quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

{¶ 54} After a full review of Rhone's expert report, the court held that:

To the extent the report contains opinions at all, they are (1) contrary to the Court's findings of fact and conclusions of law in the May 29, 2007 Decision in Case No. 2006-CV-4854; (2) purported legal opinions that are not proper; or (3) not relevant to the matters at issue in this case and/or any probative value is substantially outweighed by the danger of confusing the issues."

Liminal Entry 2 at p. 2. Based on this decision, the court also refused to let Carter testify at trial.

{¶ 55} In *Daubert*, the United States Supreme Court "interpreted Fed.R.Evid. 702, the federal version of [Ohio's] Evid.R. 702, as vesting the trial court with the role of gatekeeper. * * * This gatekeeping function imposes an obligation upon a trial court to assess both the reliability of an expert's methodology and the relevance of any testimony offered before permitting the expert to testify." *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 24. In *Terry*, the court remarked that it had "adopted this role for Ohio trial judges in *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 687 N.E.2d 735." *Id.*

{¶ 56} In the context of relevance, "the trial court's gatekeeping function also requires it to judge whether an expert's testimony is ' "relevant to the task at hand" in that it logically advances a material aspect of the proposing party's case.' " *Terry* at ¶ 26, quoting *Valentine v. PPG Industries, Inc.*, 158 Ohio App.3d 615, 2004-Ohio-4521, 821 N.E.2d 580 (4th Dist.), quoting *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786, 125 L.Ed.2d 469.

{¶ 57} In *Daubert,* the Supreme Court also referenced Fed.Evid.R. 403 as a rule judges should consider when assessing proffers. *Daubert* at 595. This is because " '[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.' " *Id.*, quoting Weinstein, *Rule 702 of the Fed. Rules of Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991).

{¶ 58} The only difference between the Ohio and federal rules is that in Ohio, exclusion of evidence is mandatory under Evid.R. 403(A) "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury," and is discretionary under Evid.R. 403(B) if its probative value is substantially outweighed by undue delay or by being needlessly cumulative. In contrast, exclusion of evidence is discretionary in all instances under Fed.Evid.R. 403. The language the trial court quoted in its decisions is what is found in Evid.R. 403(A), and exclusion would be mandatory in that situation. *See* Liminal Entry at p. 5, and Liminal Entry 2 at p. 2.

{¶ 59} We review decisions granting or denying motions in limine for abuse of discretion. *E.g. Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "[M]ost instances of abuse of discretion will result in decisions that are simply

unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support" it. *Id.*

{¶ 60} After reviewing the record, we see no indication that the trial court abused its discretion in granting the motion in limine. Rhone's expert report focused on issues that had already been decided in the prior action, contained statements that were either improper legal opinions or irrelevant, and would only have served to confuse the jury by having it focus on irrelevant points. Any probative value of Rhone's testimony was substantially outweighed by the danger of confusing the issues.

{¶ 61} In arguing that Rhone's testimony should have been allowed, Planchak states that Rhone would have corroborated his position "that the joint venture had ended." Appellant's Reply Brief at p. 7. However, as has been stressed, the only way the venture could have ended was if Planchak had provided proper notice as required after the May 29, 2007 judgment. Rhone's "opinions" that a "partnership" never existed or that Planchak was not an owner were clearly an attempt to relitigate issues that had been decided in the prior action.

{¶ 62} Furthermore, whether the Ladds should have filed a "partnership form" with the IRS rather than issuing a 1099 to Planchak was irrelevant and proved nothing at issue in the case. "Because a partnership is not a taxable entity for federal income tax purposes, its profits and losses flow through to the partners where they are recognized for tax purposes on an individual basis." *Adler & Drobny, Ltd. v. United States*, 9 F.3d 627, 628, fn. 3 (7th Cir.1993). Here, Planchak was provided with a statement of income

from the joint venture, and he could have obtained documents that allowed him to deduct expenses or losses (although, by his own admission, he was not eligible to take deductions if he did not actually contribute). Tr. at 242. Despite acknowledging that as a taxpayer, he was responsible for obtaining documents for his tax returns, Planchak never asked the Ladds for expense documents or for any receipts. Tr. at 127, 204, 237, 305, and 330.

{¶ 63} Again, Planchak is attempting to argue that the Ladds' conduct in treating the property for tax purposes as their "own" "established that the joint venture was thus terminated and they were using" him "as a patsy." Appellant's Brief at p. 14. However, there was no evidence of that. If the Ladds had wished to treat the condo property as their own, they would have taken credit for 100% of the expenses associated with it. Instead, they continued to pay substantial expenses and incurred losses while only being able to deduct half of what they had paid.

{¶ 64} As an additional matter, Planchak waived any objection to Pat's testimony because he failed to object during trial. Pat had a background as a tax preparer and had worked at times for the Carter and Ladd Tax Service, which was also owned by Bruce Carter, Gary, and Gary's father, who was an accountant. Tr. at 124, 282, 284, and 289. Until Gary's father died, he prepared Gary's and Pat's tax returns, which included the joint venture. After that, Bruce Carter took over and prepared the Ladds' tax returns. *Id.* at 284.

{¶ 65} Pat, rather than Gary, was the one who took care of the books for the condo property. *Id.* at 123 and 285. Based on Pat's testimony at trial, it is apparent that she

kept detailed records of all related financial matters. She testified at length about the financial records between 2007 and 2022 and the parties' tax returns for those periods. *Id.* at 285-287, 290-292, 296-319, 322-327, and 330-332. During Pat's testimony, Planchak made almost no objections, and the few he made did not concern Pat's testimony or expertise on taxes.

**{¶ 66}** To preserve error for review, a party must timely object to the evidence or testimony; failure to do so waives the error. *E.g. Becker v. Direct Energy, LP*, 2018-Ohio-4134, 112 N.E.3d 978, ¶ 54 (2d Dist.), citing S*tate ex rel. Holwadel v. Hamilton Cty. Bd. of Elections*, 144 Ohio St.3d 579, 2015-Ohio-5306, 45 N.E.3d 994, ¶ 50. Consequently, Planchak waived any error concerning Pat's testimony. He has also not asserted any plain error, and we find none.

**{¶ 67}** Because the third assignment of error lacks merit, it is overruled.


## V. Failure to Dismiss the Complaint

**{¶ 68}** Planchak's fourth assignment of error states that:

The Trial Court Erred in Failing to Dismiss the Complaint on Summary Judgment as the Plaintiff Failed to Put Defendant's Name on the Deed.

**{¶ 69}** While this assignment of error refers to "summary judgment," Planchak contends that the trial court erred in denying a motion in limine and a motion for a "directed verdict" that he filed prior to trial. According to Planchak, Gary was precluded from recovering damages because he failed to comply with the prior order to add Planchak's

name to the deed.

{¶ 70} Under Civ.R. 50(A), "[a] motion for a directed verdict may be made on the opening statement of the opponent, at the close of the opponent's evidence or at the close of all the evidence." Such motions are not made before trial. Planchak also failed to make any directed verdict motions at trial, including when Gary rested and at the close of the evidence. *See* Tr. at 352-361 and 437.

{¶ 71} The correct procedure would have been to file a motion for summary judgment, which is brought before trial and applies the same standards as directed verdicts. *William E. Weaner & Assocs., LLC v. 369 W. First, LLC*, 2d Dist. Montgomery No. 28399, 2020-Ohio-48, ¶ 30; *Knop v. Toledo*, 107 Ohio App.3d 449, 453, 669 N.E.2d 27 (6th Dist.1995). However, Planchak did not file a summary judgment motion. Moreover, even if his pretrial directed verdict motion could be construed as such, he did not attach any evidentiary materials as required by Civ.R. 56(C) and (E). *See* Combined Motion of Defendant, Michael P. Planchak, in Limine and for Directed Verdict (Aug. 9, 2022) ("Motion").

{¶ 72} The trial court overruled the combined motion. First, the court construed the motion as seeking dismissal of Gary's claim for reimbursement and found that a liminal motion was not the proper vehicle. Decision, Order, and Entry Overruling Defendant's Combined Motion in Limine and for Directed Verdict (Sept. 14, 2022) ("Liminal Decision"), p. 2. The court then addressed Planchak's argument, which was essentially that Gary's obligation to convey the deed to him was a condition precedent to the requirement that Planchak pay for expenses associated with the condominium. *Id.*

**{¶ 73}** In the motion, Planchak had argued that the use of the word "concomitant" in the 2007 judgment entry created a situation where his obligation to pay expenses never arose because Gary did not convey the property. Motion at p. 5-6. After finding that all the elements of a joint venture were present, the judge in the prior case stated that:

> * * * Given the existence of a joint venture and the parties' express and implied terms, certain consequences follow to resolve this dispute and govern their ongoing conduct and obligation. Plaintiff [Planchak] is clearly entitled to an actual legal interest in the company. Defendant [Gary] will be ordered to convey a half-interest in the Venetian property to Plaintiff. Concomitant with that benefit, Plaintiff will have the obligation to pay half of the expenses attendant with the unit. Plaintiff must pay one-half of the mortgage, common area maintenance or other condo fees, the taxes, and the insurance payments.

2007 Judgment at p. 14-15.

**{¶ 74}** After making observations about the amounts Gary had expended and that Planchak had failed to pay, the judge found that Gary was entitled to recover $20,795.66, which was half the amount he had expended. *Id.* at p. 15-16. The judge then stated:

> Accordingly, the Court decides as follows:
>
> (1) Judgment for Plaintiff, Michael P. Planchak, and against Defendant, B. Gary Ladd, ordering Defendant convey a one-half interest in the real estate located at Unit C, Building 3, Cappello I, at Venetian Golf and River Club, Phase 4B, 109 Bella Vista Terrace, 3C North Venice,

Florida 34275 to Plaintiff.

(2) Judgment for Defendant and against Plaintiff in the amount of twenty thousand seven hundred ninety-five dollars and sixty-six cents ($20,795.66) plus interest at the rate of 8% per annum from the date of judgment; and

(3) that Plaintiff and Defendant pay the expenses of ownership of the subject real estate including, but not necessarily limited to, monthly mortgage payment, condo fees, taxes, and insurance until said real estate is sold.

2007 Judgment at p. 16.

{¶ 75} In ruling on the "directed verdict/liminal motion," the trial court in the current case said that it would not find that Judge O'Connell had created a condition precedent for either party in the 2007 judgment. Liminal Decision at p. 3. As a result, the court overruled Planchak's motion.

{¶ 76} At trial, during the discussion on jury instructions, Planchak objected to the court's intended instruction on "condition precedent." Tr. at 442. The instruction in question was inserted after the court had read certain parts of the 2007 Judgment to the jury. This instruction stated that:

Condition precedent requires that a conditional event occur before the subsequent obligation arises. None of the obligations contained in the May 29, 2007 decision are conditions precedent to any other obligation.

Tr. at 501.

**{¶ 77}** In objecting to the instruction, Planchak's counsel argued that she thought "the phrase about concomitant with this interest that's in the judgment entry before has certain definitional qualities that make it a condition precedent. And so I think that that instruction is counter to the usual and ordinary reading of that, or is, according to the (indiscernible)." *Id.* at 442-443. The trial court disagreed and said the instruction would stand. *Id.* at 443.

**{¶ 78}** The definition of "concomitant" used as an adjective is "accompanying especially in a subordinate or incidental way." Used as a noun, the definition is "something that accompanies or is collaterally connected with something else." https://www.merriam-webster.com/dictionary/concomitant (accessed on November 30, 2023).

**{¶ 79}** The idea of being merely subordinate or collaterally connected is not consistent with a condition precedent. For example, in the context of contracts generally, "a condition precedent is one that is to be performed before the agreement becomes effective. It calls for the happening of some event, or the performance of some act, after the terms of the contract have been agreed on, before the contract shall be binding on the parties." *Mumaw v. W. & Southern Life Ins. Co.*, 97 Ohio St. 1, 11, 119 N.E. 132 (1917). Similarly, in the context of insurance contracts, notice provisions are conditions precedent to coverage, meaning that if insureds fail to give timely notice of an event like litigation being brought against them, the insureds are barred from recovery. *Pennsylvania Gen. Ins. Co. v. Park-Ohio Industries,* 126 Ohio St.3d 98, 2010-Ohio-2745, 930 N.E.2d 800, ¶ 13-14.

**{¶ 80}** Although the 2007 judgment concluded that a joint venture existed, it did not create conditions that had to be satisfied before the agreement would be binding; a binding agreement already existed, as the court found. The court also did not dictate the terms of any contract or agreement. Instead, the court simply imposed orders on the parties: (1) Planchak was to pay an amount for expenses Gary had already incurred; (2) Gary was to convey property to Planchak; and (3) both parties were to continue to pay expenses for the condo until it was sold. None of these obligations were conditions precedent to any other.

**{¶ 81}** We also note that on September 24, 2019, Planchak filed a motion in the prior action (Case No. 2006 CV 4854) asking for an order directing the execution and recording of a quit claim deed to the property, pursuant to Civ.R. 70. Planchak then voluntarily dismissed this motion on September 26, 2019.[3]

**{¶ 82}** Civ.R. 70 provides, in pertinent part, that:

> If a judgment directs a party to execute a conveyance of land, to transfer title or possession of personal property, to deliver deeds or other documents, or to perform any other specific act, and the party fails to comply within the time specified, the court may, where necessary, direct the act to be done at the cost of the disobedient party by some other person appointed by the court, and the act when so done has like effect as if done by the

---

[3] "Under well-recognized law, we may take judicial notice of public records and judicial opinions that can be accessed via the internet." *Clark v. Beyoglides*, 2021-Ohio-4588, 182 N.E.3d 1212, ¶ 6, fn. 1 (2d Dist.), citing *True Care Early Learning Ctr. v. Ohio Dept. of Job & Family Servs.*, 2020-Ohio-954, 152 N.E.3d 1017, ¶ 24, fn.5 (2d Dist.).

party.

{¶ 83} According to Gary, the deed was transferred in 2019. Tr. at 160. Planchak admitted in the current action that on October 10, 2019, a quitclaim deed transferring 50% of the interest in the condo to him had been delivered to his attorney, and that he (Planchak) had not attempted to file the deed. *Id.* at 251-253 and Plaintiff's Ex. 42. Thus, by the time Planchak filed the "summary judgment motion" in the current case, and by the time of trial, the deed to the condo had already been transferred to Planchak. *See Wayne Bldg. & Loan Co. of Wooster v. Yarborough*, 11 Ohio St.2d 195, 212, 228 N.E.2d 841 (1967) (holding that "a deed does not have to be recorded to pass title. Whether or not recorded, a deed in Ohio passes title upon its proper execution and delivery, so far as the grantor is able to convey it"). *Accord Option One Mtge. Corp. v. Boyd*, 2d Dist. Montgomery No. 18715, 2001 WL 669531, *2 (June 15, 2001).

{¶ 84} Based on the preceding discussion, the trial court did not err in failing to dismiss the complaint or in instructing the jury as to "condition precedent." Accordingly, the fourth assignment of error is overruled.


VI.   Mitigation of Damages

{¶ 85} Planchak's fifth assignment of error states that:

The Trial Court Erred When, After the Jury in Response to an Interrogatory Asking Whether Plaintiff Failed to Mitigate Damages, Answered in the Affirmative, Failed to Offer Any Setoff [sic].

{¶ 86} Under this assignment of error, Planchak contends that error occurred

because the jury found, in response to interrogatory four, that Gary had failed to mitigate his damages, but it still awarded Gary the full amount of the damages he requested. In response, the Ladds argue that Planchak waived any issue on this point because he failed to raise it in the trial court. Additionally, the Ladds maintain that Planchak's argument is barred by res judicata because he failed to assert it when moving for a new trial. They further assert that the interrogatory was consistent with the general verdict because any lack of mitigation did not proximately cause Planchak's damages to be reduced or, alternatively, the lack did not benefit Planchak because he abandoned the joint venture. Appellees' Brief at p. 22. Planchak did not respond to these arguments in his reply brief.

{¶ 87} The jury was given 19 interrogatories and six verdict forms, and the court instructed the jury on how to fill out the forms. Tr. at 517-524. The record indicates that neither side objected at trial to the interrogatories or to the verdict forms. *Id.* at 453 and 529. During deliberation, the jury conveyed a question regarding the fact that it was at a "stalemate" on interrogatory four, and the judge gave the jury further instructions. *Id.* at 531-534. The jury then continued deliberating. Subsequently, the jury returned to court and the court read the answers and verdicts into the record. *Id.* at 536-540.

{¶ 88} All eight jurors answered "yes" to interrogatory three, which asked if Gary had proven by the greater weight of evidence that Planchak breached the joint venture contract. Based on that answer, the jurors were instructed to proceed to interrogatory four, which asked if Planchak had proved by the greater weight of the evidence that Gary "failed to mitigate his damages in a manner that reduces or prevents the recovery of some or all damages." Six jurors signed "yes" to that interrogatory. The jurors were then

instructed to proceed to interrogatory five, which concerned whether Gary had acted with unclean hands. All eight jurors responded "no" to that interrogatory.

{¶ 89} The jury was then instructed to answer interrogatory six, which asked the amount of damages Gary sustained as a result of Planchak's breach of the joint venture contract. Six jurors answered "yes" and filled in the amount of damages as "$198,046.97." Four of these jurors had answered yes to interrogatory four.

{¶ 90} Given the answer to interrogatory six, the jury was instructed to complete Verdict Form No. 1, consistent with their answers to interrogatory numbers one through six. Verdict Form No. 1 found in Gary's favor on the breach of contract claim and awarded damages in the amount of $198,046.97. The same six jurors who signed this form had also signed interrogatory six, and the damages were consistent with what was specified in that interrogatory answer.

{¶ 91} In all the rest of the interrogatory answers and verdict forms, the jury unanimously rejected Planchak's claims against Gary for fraudulent transfer, fraud, breach of fiduciary duty, and theft, and rejected Planchak's claim against Pat for unjust enrichment. Court's Ex. III (Oct. 17, 2022). (The court had dismissed the other claims against Pat before giving the case to the jury).

{¶ 92} After the court read the interrogatory answers and verdicts, it allowed the parties to review them; the court then asked if either counsel wished to have the jury polled. Both counsel declined. Tr. at 440. The court then dismissed the jury, said it would come back to thank the jury, and told the jury members they could speak with the attorneys at that time but were under no obligation to do so. *Id.* After this, the court

adjourned and asked the attorneys if they needed to put anything on the record. Both attorneys again declined to do so. *Id.* at 541.

{¶ 93} "Civ.R. 49(B) governs the use of interrogatories in connection with a general verdict." *Cincinnati Riverfront Coliseum, Inc. v. McNulty, Co.*, 28 Ohio St.3d 333, 336, 504 N.E.2d 415 (1986). "The essential purpose to be served by interrogatories is to test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial." *Id.* at 337-337, citing *Davison v. Flowers*, 123 Ohio St. 89, 174 N.E. 137 (1930). "If the jury's answers to the special interrogatories are inconsistent with its general verdict, then the court may enter judgment in accordance with the special interrogatories, return the jury for further deliberations, or order a new trial." *Shoemaker v. Crawford*, 78 Ohio App.3d 53, 60, 603 N.E.2d 1114 (10th Dist.1991), citing Civ.R. 49(B).

{¶ 94} However, "any objections to interrogatories must be raised while the jury is still impaneled and the court has the full range of choices before it." *Id.* at 61, citing *Schade*, 70 Ohio St.2d 207, 436 N.E.2d 1001. Failure to do so results in waiver of the issue. *Id.* Two main policy rationales exist for requiring objections: "(1) to promote the efficiency of trials by permitting the reconciliation of inconsistencies without the need for a new presentation of evidence to a different trier of fact, and (2) to prevent jury shopping by litigants who might wait to object to an inconsistency until after the original jury is discharged." *Greynolds v. Kurman*, 91 Ohio App.3d 389, 395, 632 N.E.2d 946 (9th Dist.1993), citing *Haehnlein v. Henry*, 41 Ohio App.3d 233, 234, 535 N.E.2d 343 (9th

Dist.1987). There is no question here that Planchak failed to raise this matter while the jury was still impaneled and therefore waived the issue.

{¶ 95} In a few instances, courts have considered plain error review. *E.g., O'Connell v. Chesapeake & Ohio RR. Co.*, 58 Ohio St.3d 226, 229, 569 N.E.2d 889 (1991) (applying plain error where jury interrogatories were inconsistent with each other and there was no general verdict). As we have stressed, plain error review is employed in "extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Goldfuss*, 79 Ohio St.3d at 121, 679 N.E.2d 1099. The Supreme Court of Ohio also commented in *Goldfuss* that "[t]he plain error doctrine should never be applied to reverse a civil judgment simply because a reviewing court disagrees with the result obtained in the trial court, *or to allow litigation of issues which could easily have been raised and determined in the initial trial*. (Emphasis added.) *Id.* at 122.

{¶ 96} As we mentioned, Planchak did not respond to the arguments in the Ladds' brief. He has also not asserted plain error. Moreover, this case does not involve the same circumstances as *O'Connell*. For example, the appellant there argued "that when the jury interrogatories were returned, neither counsel nor the court had reason to suspect the inconsistencies that were later discovered." *O'Connell* at 229. In contrast, Planchak's counsel was notified during jury deliberations about a potential issue with interrogatory four and would have had reason to pay particular attention to that interrogatory answer when the interrogatory answers and verdicts were read.

**{¶ 97}** In a similar situation, the Eighth District Court of Appeals refused to apply a plain error exception. *See Avondet v. Blankstein*, 118 Ohio App.3d 357, 692 N.E.2d 1063 (8th Dist.1997). There, the court remarked that:

> We distinguish the instant case from *O'Connell v. Chesapeake & Ohio RR. Co.* (1991), 58 Ohio St.3d 226, 569 N.E.2d 889, where the inconsistencies between the general verdict and the interrogatories were not apparent until the jury was discharged. In *O'Connell*, the inconsistencies were created by inconsistencies in the participation of the jurors in answering the interrogatories. For instance, one of the jurors did not respond to the proximate cause interrogatory, yet participated in apportioning the fault between the two parties, and another juror did not respond to the interrogatory regarding whether one of the parties was negligent, but then in the interrogatory apportioning the percentage of fault, found the party thirty-percent negligent. In the case herein, the inconsistency between the interrogatories and the verdict was apparent on its face and does not justify a plain-error exception.

*Id.* at 369.

**{¶ 98}** For the reasons stated above, we find no justification for a plain error exception. Furthermore, there was no inconsistency here between interrogatory six and the verdict. Both were signed by the same six jurors and both found the same amount of damages due to Planchak's breach of contract. In addition, while interrogatory four might be said to be facially inconsistent with interrogatory six, that point is arguable.

Specifically, while the answer to interrogatory four indicated that Gary failed to mitigate in a manner that reduced or prevented the recovery of some or all damages, the interrogatory did not mention the issue of proximate cause. In contrast, interrogatory six asked what damages Gary sustained as a "proximate result" of Planchak's breach of contract. In other words, the jury could have found that any failure to mitigate was not proximately connected to the expenses that Gary sustained.

{¶ 99} "To prevail on a claim for breach of contract, the claimant must demonstrate the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. * * * It is axiomatic that damages must be the natural and proximate result of the defendant's breach." *Mills v. Best Western Springdale*, 10th Dist. Franklin No. 08AP-1022, 2009-Ohio-2901, ¶ 13.

{¶ 100} "Under Ohio law, the injured party in a breach-of-contract action has a duty to mitigate damages, meaning that the injured party cannot recover damages 'that it could have prevented by "reasonable affirmative action." ' " *First Fin. Bank, N.A. v. Cooper*, 2016-Ohio-3523, 67 N.E.3d 140, ¶ 23 (1st Dist.), quoting *Four Seasons Environmental, Inc. v. Westfield Cos.*, 93 Ohio App.3d 157, 159, 638 N.E.2d 91 (1st Dist.1994). "An injured party need only use 'reasonable, practical care and diligence, not extraordinary measures to avoid excessive damages.' " *Id.*, quoting *Provident Bank v. Barnhart*, 3 Ohio App.3d 316, 320, 445 N.E.2d 746 (1st Dist.1982). "The failure to mitigate damages is an affirmative defense, meaning that the burden of proof lies with the breaching party." *Id.*, citing *Jindal Builders & Restoration Corp. v. Brown & Cris*, 1st Dist. Hamilton Nos. C-970029 and C-970050, 1997 WL 674621, *1 (Oct. 31, 1997). At trial, Planchak did not

testify as to any claimed amount, other than saying that in the current case, what he was entitled to was the return of his initial investment, i.e., $67,500. Tr. at 233. However, this claim was barred by res judicata, as Planchak had asked for his investment back in the prior action, and his claim was rejected. *See Planchak*, Case No. 06 CV 4854, Planchak Complaint (June 22, 2006), p. 1-2; 2007 Judgment at p, 6 and 16. In the current case, Planchak did not offer any viable specific amount that would have allowed a jury to consider mitigation in its award of damages.

{¶ 101} Furthermore, according to the trial testimony, the original mortgage on the property (an interest-only mortgage at Planchak's insistence) was around $480,000. By 2013, the mortgage balance on the property was still about $441,072. At some point, the Ladds obtained a variable rate, so principal was being paid down, and they also paid additional payments with their own (separate) money to reduce the interest rate and pay less interest. As of July 15, 2022 (shortly before trial), the mortgage was only around $287,264, which meant that the Ladds had reduced the mortgage liability by around $190,000, which benefitted Planchak. Tr. at 129-130, 136-140, 330, and 331-332.[4] Gary indicated that at that point, in his opinion, the fair market value of the condo and the remaining amount on the loan were about the same. *Id.* at 139.

{¶ 102} In view of this reduction of the balance and the fact that a lower interest rate had been obtained (meaning more principal had been paid off than under the mortgage terms Planchak originally requested), the jury may well have decided that even if Gary failed to mitigate in some manner, he was still entitled to recoup one-half of the

---

[4] The actual reduction in the mortgage balance was $192, 736.

expenses he had paid. There is also the fact that due to Planchak's refusal to pay, the Ladds were not allowed to take credit on their income tax returns for many years for expenses they did pay. This was undisputed. Tr. at 124 and 298-299. Accordingly, even if we were inclined to consider plain error (which we are not), there was no manifest miscarriage of justice.

{¶ 103} On the subject of damages, "[i]n Ohio, it has long been held that the assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb the jury's assessment absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive." *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 655, 635 N.E.2d 331 (1994), citing *Toledo, Columbus & Ohio River RR. Co. v. Miller*, 108 Ohio St. 388, 402-403, 140 N.E. 617 (1923). Planchak raised no such issues here.

{¶ 104} As a final matter, we do reject the Ladds' argument regarding the application of res judicata to the jury interrogatory issue. According to the Ladds' brief, Planchak's claim is barred by res judicata because he failed to raise it in his motion for new trial. *See* Appellees' Brief at p. 19-20. However, the cited cases (from the criminal context) refer to the fact that successive motions for a new trial are barred by res judicata. *E.g., State v. Baker*, 2d Dist. Greene No. 09-CA-53, 2010-Ohio-2915, ¶ 2. There was only one motion here. Furthermore, the one civil case the Ladds cite involved a litigant who filed three Civ.R. 60(B) motions to vacate a trial court judgment. *See Bank of New York v. Jackson*, 8th Dist. Cuyahoga No. 99874, 2013-Ohio-5133, ¶ 10-15. Clearly, the second and third motions to vacate in that case were barred by res judicata.

{¶ 105} Nonetheless, the Ladds make a valid point about Planchak's failure to raise the interrogatory issue in his new trial motion. While Planchak is not precluded by res judicata from asserting this issue, his failure to mention it even in the post-trial motion reinforces our decision not to apply the plain error doctrine.

{¶ 106} Based on the preceding discussion, the fifth assignment of error is overruled.

## VII. Tax Returns

{¶ 107} Planchak's sixth and final assignment of error states that:

The Trial Court Erred in Declining to Order the Plaintiff to Produce

Tax Returns Certified by the Internal Revenue Service.

{¶ 108} Under this assignment of error, Planchak contends that the trial court erred in refusing to order the IRS to produce the Ladds' tax returns. According to Planchak, the court's reason for refusing, i.e., that it would delay the trial, was misplaced because the court only had to direct the Ladds to execute an authorization, which is commonly done. In response, the Ladds note that they did, in fact, provide Planchak with IRS authorizations, and Planchak sent the forms to the IRS. They also note that Planchak received copies of their complete tax returns, accompanied by an affidavit of their tax preparer verifying the authenticity of the returns. Appellees' Brief at p. 24. Again, Planchak did not respond to these points in his reply brief.

{¶ 109} Planchak's assignment of error relates to a pro se request he filed on June 13, 2022 (when he was between attorneys), asking the trial court to order the IRS to

provide the Ladds' 2005-2021 tax returns. The court overruled his request. *See* Order Denying Defendant's Motion to Direct the IRS to Provide Tax Returns (July 8, 2022) ("Discovery Order").

**{¶ 110}** The law is well settled that "courts have broad discretion over discovery matters," and their decisions are reviewed for abuse of discretion. *State ex rel. Citizens for Open, Responsive & Accountable Govt. v. Register*, 116 Ohio St.3d 88, 2007-Ohio-5542, 876 N.E.2d 913, ¶ 18. *Accord Riverside v. State*, 2016-Ohio-2881, 64 N.E.3d 504, ¶ 38 (2d Dist.). As noted, an abuse of discretion means the trial court acted arbitrarily, unconscionably, or unreasonably, which is generally interpreted as indicating the court's decision was unreasonable, i.e., unsupported by a sound reasoning process. *AAAA Ents.,* 50 Ohio St.3d at 161, 553 N.E.2d 597.

**{¶ 111}** The background of the trial court's July 2022 discovery order was as follows. In late November 2018, Gary filed a complaint for foreclosure against Planchak. Based on the parties' agreement, the court administratively stayed the action in March 2019, pending the outcome of litigation concerning the validity of the certificate of judgment issued in the prior action. The case was reactivated in October 2019, when Gary was allowed to file an amended complaint to add the breach of contract claim. At the time of the stay and when Planchak filed an answer to the amended complaint, a counterclaim, and a third-party complaint in November 2019, Planchak was represented by counsel. The same counsel continued to represent Planchak until he was allowed to withdraw on May 31, 2022, or about three and a half years after the action was filed. As litigation time is generally measured, this was a massive time period within which to

conduct discovery.

{¶ 112} As indicated above, Planchak filed a motion to compel discovery in mid-May 2020. On May 27, 2020, the Ladds informed the court that they had already provided all the tax records in their possession. By that time, the parties had also agreed to execute signed IRS forms that would allow release of their tax records to the other side. *See* Opposition to Motion to Compel (May 27, 2020), p. 2.

{¶ 113} In early June 2020, Planchak's counsel sent the IRS the 4506 Forms the Ladds had executed. *See* Ex. D attached to Planchak's July 16, 2021 motion to compel. Hearings on the original motion to compel were continued a number of times. However, in early February 2021, after the Ladds filed affidavits with the court stating they had provided all tax records in their possession, the court overruled the May 2020 motion to compel as moot.

{¶ 114} As indicated, Planchak filed another motion to compel in July 2021, which was more than a year after the 4506 Form was sent to the IRS. This motion involved the Ladds' refusal to execute further IRS forms that would name Planchak's counsel as their power of attorney. *See* Plaintiff and Third-Party Defendants' Response in Opposition to Motion to Compel (July 21, 2021), p. 5. A few other unrelated discovery matters were also included in Planchak's July 2021 motion to compel. In August 2021, Planchak filed another motion to compel, this time seeking to compel non-party Bruce Carter to comply with a subpoena that had been sent to him for production of the Ladds' income tax records. At the time, the jury trial was scheduled to begin in late October 2021.

{¶ 115} In August 2021, the court continued the trial until mid-May 2022. In a

separate decision, the court ordered the Ladds to complete and submit to the IRS a Form 2848 appointing their own counsel as power of attorney for purposes of obtaining the tax returns; the Ladds' attorney was also ordered to submit another request to the IRS for the Ladds' tax returns and to provide them to Planchak's attorney. Decision, Order, and Entry Overruling in Part and Sustaining in Part All Pending Motions of Defendant (Aug. 28, 2021), p. 2. The court further stated that "Counsel for Plaintiff is required to make reasonable effort following submission of his request to obtain the tax returns in a timely manner, *understanding it is within the IRS's control*." (Emphasis added.) *Id*. at p. 3. The court also stayed the subpoena directed to Carter pending receipt of the tax returns from the IRS. *Id.*

**{¶ 116}** Nearly six months later, in mid-March 2022, Planchak filed a motion to continue the May 2022 trial date. At that time, while the needed documents had been submitted to the IRS, neither party had received a response. Defendant's Motion to Continue the Trial; Motion for Extension of Time to Complete Discovery; and Motion for Extension of Time to File Defendant's Expert Report (Mar. 16, 2022), p. 1. In this motion, Planchak acknowledged that the Ladds' counsel had picked up the Ladds' tax returns from 2006 to 2020 directly from the Ladds' tax professional and had delivered them to Planchak's counsel on or around March 1, 2022. *Id.*

**{¶ 117}** After holding a status hearing with the parties, the court again continued the trial. The court filed an order on April 4, 2022, continuing the discovery deadline and setting a trial date of October 11, 2022. As noted, Planchak's counsel was allowed to withdraw on May 31, 2022. Then, on June 13, 2022, Planchak asked the court to order

the IRS to produce the tax returns, and, as we said, the trial court denied the request.

**{¶ 118}** In its decision denying Planchak's motion, the court stated that:

The parties have had multiple conferences with the Court over the past year and a half, all related to the discovery of the tax returns for Mr. and Mrs. Ladd. The trial in this matter has been delayed at least three times as a result of this issue. Defendant admits in his motion that the accounting firm, Ladd Carter Tax Service, has produced the requested tax forms. Defendant is asking this Court for an order to the IRS because it does not trust these returns because Plaintiff previously had an interest in the firm.

This case has been pending for almost four years. The trial has been continued <u>four times</u>, with the fifth trial date set for this September. In addition, this Court agrees with Plaintiff that it likely does not have jurisdiction to order the IRS to produce the returns, and even if it did, the IRS is unlikely to comply, certainly not before the scheduled trial date. This Court is not willing to keep dragging out this case on the outside chance the IRS produces tax returns that are already in Defendant's possession."

(Emphasis sic.) Discovery Order, p. 1-2.

**{¶ 119}** The court's decision was supported by sound reasoning and was not an abuse of discretion. Indeed, the case had been pending for an inordinate amount of time, and the trial date had been extended several times to accommodate Planchak. According to Planchak, all the court had to do was to direct the Ladds to execute a Form

4506. However, the Ladds had already signed this form, and Planchak's attorney had sent it to the IRS in June 2020. In addition, more than a year elapsed before Planchak filed another motion to compel. And, while the court granted that motion, Planchak allowed six more months to pass before he asked the court in June 2022 to order the IRS to produce the tax returns. In view of this history, the court's refusal to allow further delay was very reasonable.

{¶ 120} Planchak also suggests that the court should have ordered the Ladds to obtain their transcripts online. In this vein, Planchak has provided an internet link to the IRS. *See* Appellant's Brief at p. 17.

{¶ 121} As a preliminary point, Planchak never mentioned this in the trial court. *See* Defendant's Motion for a Court Order Directed to the IRS to Provide Tax Returns of B Gary Ladd and Patricia Ladd (2005-2021) (June 13, 2022) ("Tax Motion"). Trial courts are not required to devise arguments for parties. Furthermore, the IRS website indicates that tax return transcripts are available for only the current year and the three prior tax years. *See* https://www.irs.gov/individuals/transcript-types-and-ways-to-order-them (accessed Dec. 5, 2023). A "tax account transcript" is available for the current year and nine prior years. However, it is quite limited, as it only offers "basic data such as filing status, taxable income, and payment types." *Id*. Again, this was never raised in the trial court. The law is well-settled that "[a] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus.

**{¶ 122}** As the trial court noted, there was also no assurance that a subpoena or order issued to the IRS would have been effective. *Compare Mentor Way Real Estate Partnership v. Hertanu*, 8th Dist. Cuyahoga No. 103267, 2016-Ohio-4692 (dismissing case for lack of final appealable order). In *Mentor Way*, a real estate partnership had issued a subpoena to the IRS to obtain documents that would show the amount of withholding taxes another party owed the federal government. In response, "[t]he IRS told MWREP [the partnership] that it was prohibited by federal law from releasing the information to a third party, but could divulge the information if Mentor Way [the lessor] filed an IRS Form 8821 to designate third-party authorization to receive tax information." *Id.* at ¶ 3. Clearly, the IRS would not comply with a court order or subpoena, and filing a form with the IRS is consistent with what was done here.

**{¶ 123}** "Section 6103 of the Internal Revenue Code 26 U.S.C. § 6103, lays down a general rule that 'returns' and 'return information' as defined therein shall be confidential." *Church of Scientology of California v. I.R.S.*, 484 U.S. 9, 10, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987). "In addition to the returns themselves, which are protected from disclosure by § 6103(b)(1), § 6103(b)(2) contains an elaborate description of the sorts of information related to returns that [the IRS] is compelled to keep confidential." *Id.* at 14-15. However, in certain instances, disclosure is allowed. For example, 26 U.S.C. 6103(c) allows the IRS to "disclose the return of any taxpayer, or return information with respect to such taxpayer, to such person or persons as the taxpayer may designate in a request for or consent to such disclosure, or to any other person at the taxpayer's request to the extent necessary to comply with a request for information or assistance made by

the taxpayer to such other person." There is no provision in this statute for disclosure in state civil litigation through issuance of orders or subpoenas to the IRS.

{¶ 124} Courts have held that " '[w]hen a litigant seeks to obtain documents from a non-party federal governmental agency, the procedure varies depending on whether the underlying litigation is in federal or in state court. In state court the federal government is shielded by sovereign immunity, which prevents the state court from enforcing a subpoena. * * * Moreover, a court cannot enforce a subpoena against an employee of the federal governmental agency when the agency has validly enacted a regulation * * * that withdraws from employees the power to produce documents. * * * Thus, a state-court litigant must request the documents from the federal agency pursuant to the agency's [*Touhy*] regulations * * *. If the agency refuses to produce the requested documents, the sole remedy for the state-court litigant is to file a collateral action in federal court *under the APA*.' " (Emphasis sic.) *Rimmer v. Holder*, 700 F.3d 246, 262 (6th Cir.2012), quoting *Houston Bus. Journal, Inc. v. Office of the Comptroller of the Currency*, 86 F.3d 1208, 1211-1212 (D.C.Cir.1996), referencing *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462, 467, 71 S.Ct. 416, 95 L.Ed. 417 (1951).

{¶ 125} " 'The Department of the Treasury has its own set of *Touhy* regulations set forth at 31 C.F.R. § 1.11 and throughout 26 C.F.R. §§ 301.9001-1 to -7. Based on the text of these regulations, a party requesting records or information from the IRS must provide the agency with a written statement which includes various information set forth under 26 C.F.R. §§ 301.9001-5.' " *Black v. 7714 Entertainment, Corp.*, E.D.N.Y. No. 21-CV-4829, 2023 WL 4565037, *3 (July 17. 2023), quoting *Carbone v. Martin*, E.D.N.Y. No.

CV 18-3509, 2021 WL 1224102, *1 (Mar. 31, 2021).

{¶ 126} 26 C.F.R. 301.9000-6 provides various examples that illustrate the regulations in 26 C.F.R. 301.9000-1 through 26 C.F.R. 301.9000-5. As relevant here, Example 10 states that:

> In a state court tort action, Defendant subpoenas IRS for Plaintiff's federal income tax returns for particular taxable years. This is a non-IRS matter. The Disclosure Officer instructs Defendant that the IRS has established procedures for obtaining copies of Federal income tax returns. Section 601.702(d)(1) of this chapter establishes the procedures for obtaining Federal tax returns by requiring written requests for copies of tax returns using IRS Form 4506, "Request for Copy of Tax Return." At Defendant's request, Plaintiff executes Form 4506, naming Defendant's counsel as designee, and the form is properly submitted to IRS. A testimony authorization would not be required to disclose Plaintiff's returns to Defendant's counsel.

{¶ 127} The point here is that even if the trial court had issued an order to the IRS to produce the Ladds' tax returns, the court would not have been able to enforce it. Instead, the procedure would have been to submit an executed Form 4506 (as was done here in 2020).

{¶ 128} Also important, however, in analyzing the trial court's decision, is the fact that Planchak received the Ladds' tax returns in March 2022. In the trial court, Planchak attached an affidavit of Bruce Carter as Exhibit A to his motion for a court order directing

the IRS to provide the returns. *See* Tax Motion, Ex. A. In the affidavit, Carter stated that he was a registered tax preparer and had prepared the tax returns for the Ladds for several years. Ex. A, ¶ 2-3. Carter further said that as part of his practice "in accordance with IRS regulations," he had maintained copies of the Ladds' tax returns after they were filed. *Id.* at ¶ 3. Carter also said he had given copies of the returns from 2006-2020 to the Ladds' attorney, Todd Bryant. (Planchak has never disputed that he then received copies of these returns.) *Id.* at ¶ 4. Finally, Carter stated, "The copies I provided to Mr. Bryant were true, accurate, and complete copies of the returns that were filed with the IRS during the relevant years, as applicable." *Id.* at ¶ 5.

{¶ 129} Thus, Planchak had copies of the tax returns, and the trial court did not use unsound reasoning in denying his request. The case had already been pending for a significant time, and the IRS had not provided the records for two and a half years. There was no reason to think a further delay would have succeeded, particularly since the trial court did not have the power to order the IRS to do anything.

{¶ 130} We also note that in the trial court and here, Planchak has alleged that fraud occurred in connection with the joint venture and that he needed the tax returns from the IRS to compare with the returns he received. However, a tax professional verified the returns were those that had been filed with the IRS, and there was no evidence indicating that Carter had engaged in fraud or submitted a false affidavit, which could expose him to perjury charges. And, as indicated, the jury found unanimously that Gary did not commit fraud.

{¶ 131} Based on the preceding discussion, the sixth assignment of error is

overruled.

## VIII.   Conclusion

{¶ 132} All of Planchak's assignments of error having been overruled, the judgments of the trial court are affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.